## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| BARBARA ANN WALDER, | CASE NO. 1:15-cv-00433-GBC |
| Plaintiff, | (MAGISTRATE JUDGE COHN) |
| v. | **MEMORANDUM** |
| CAROLYN W. COLVIN, COMMISSIONER OF SOCIAL SECURITY, | |
| Defendant. | Docs. 1, 5, 6, 7, 8 |

## MEMORANDUM

### I.      Procedural Background

The above-captioned action is one seeking review of a decision of the Commissioner of Social Security ("Defendant") denying the application of Barbara Ann Walder ("Plaintiff") for benefits under the Social Security Act, 42 U.S.C. §§401-433, 1382-1383 (the "Act") and Social Security Regulations, 20 C.F.R. §§404.1501 *et seq.*, §§416.901 *et. seq.*[1] (the "Regulations").

On February 2, 2012, Plaintiff applied for benefits under the Act. (Tr. 129-32). On May 2, 2012, the Bureau of Disability Determination ("state agency") denied Plaintiff's application (Tr. 74-94), and Plaintiff requested a hearing. (Tr.

---

[1] Part 404 governs DIB, Part 416 governs SSI. *See Sims v. Apfel*, 530 U.S. 103, 107 (2000). Like *Sims*, these regulations "are, as relevant here, not materially different" and the Court "will therefore omit references to the latter regulations." *Id.*

101-02). On May 21, 2013, an ALJ held a hearing at which Plaintiff—who was represented by an attorney—and a vocational expert ("VE") appeared and testified. (Tr. 46-73).   On June 16, 2013, the ALJ found that Plaintiff was not entitled to benefits. (Tr. 9-23). Plaintiff requested review with the Appeals Council (Tr. 7-8), which the Appeals Council denied on January 23, 2015, affirming the decision of the ALJ as the "final decision" of the Commissioner. (Tr. 1-3). *See Sims v. Apfel*, 530 U.S. 103, 107 (2000).

On March 2, 2015, Plaintiff filed the above-captioned action pursuant to 42 U.S.C. § 405(g) to appeal the decision of the Commissioner. (Doc. 1). On May 7, 2015, the Commissioner filed an answer and administrative transcript of proceedings. (Docs. 5, 6). On June 16, 2015, Plaintiff filed a brief in support of the appeal ("Pl. Brief"). (Doc. 7). On July 16, 2015, Defendant filed a brief in response ("Def. Brief"). (Doc. 8). Plaintiff did not file a reply. On March 31, 2016, the parties consented to the adjudication of this case by the undersigned. (Doc. 12). The matter is now ripe for review.

## II.    Standard of Review and Sequential Evaluation Process

To receive benefits under the Act, a claimant must establish an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12

months." 42 U.S.C. § 423(d)(1)(A); 42 U.S.C. § 1382c(a)(3)(A). The Act requires

that a claimant for disability benefits show that:

> He is not only unable to do his previous work but cannot, considering
> his age, education, and work experience, engage in any other kind of
> substantial gainful work which exists in the national economy,
> regardless of whether such work exists in the immediate area in which
> he lives, or whether a specific job vacancy exists for him, or whether
> he would be hired if he applied for work.

42 U.S.C. § 423(d)(2)(A); 42 U.S.C. § 1382c(a)(3)(B).

The ALJ uses a five-step evaluation process to determine if a person is

eligible for disability benefits. *See* 20 C.F.R. § 404.1520. The ALJ must

sequentially determine: (1) whether the claimant is engaged in substantial gainful

activity; (2) whether the claimant has a severe impairment; (3) whether the

claimant's impairment meets or equals a listed impairment from 20 C.F.R. Part

404, Subpart P, Appendix 1 ("Listing"); (4) whether the claimant's impairment

prevents the claimant from doing past relevant work; and (5) whether the

claimant's impairment prevents the claimant from doing any other work. *See* 20

C.F.R. §§ 404.1520. Before step four in this process, the ALJ must also determine

Plaintiff's residual functional capacity ("RFC"). 20 C.F.R. §§ 404.1520(e).

The disability determination involves shifting burdens of proof. The

claimant bears the burden of proof at steps one through four.  If the claimant

satisfies this burden, then the Commissioner must show at step five that jobs exist

in the national economy that the claimant can perform. *Mason v. Shalala*, 994 F.2d

1058, 1064 (3d Cir. 1993). The ultimate burden of proving disability under the Act lies with the claimant. *See* 42 U.S.C. § 423(d)(5)(A); 20 C.F.R. § 416.912(a).

The Court reviews the ALJ's decision under the deferential substantial evidence standard. *Reefer v. Barnhart*, 326 F.3d 376, 379 (3d Cir. 2003). Substantial evidence supports the ALJ decision unless no "reasonable mind might accept [the relevant evidence] as adequate to support a conclusion." *Id.* (internal citations omitted). "Stated differently, this standard is met if there is sufficient evidence 'to justify, if the trial were to a jury, a refusal to direct a verdict.'" *Id.* (quoting *Universal Camera Corp. v. NLRB,* 340 U.S. 474, 477, 71 S.Ct. 456, 95 L.Ed. 456 (1951)). Substantial evidence is "less than a preponderance" and "more than a mere scintilla." *Jesurum v. Sec'y of U.S. Dep't of Health & Human Servs.*, 48 F.3d 114, 117 (3d Cir. 1995) (citing *Richardson v. Perales*, 402 U.S. 389, 401 (1971)).

### III.   Relevant Facts in the Record

Plaintiff testified that she had worked at Northeastern Pennsylvania Physician's Organization ("NEPO") "certify[ying] clients to have different procedures for [an insurance company]." (Tr. 53). She explained that this was "a phone job" with "mostly sitting" and no "lifting or carrying." (Tr. 54). She testified that her job at NEPO ended when it "closed down; there was no further job there." (Tr. 54). The VE characterized this as a sedentary job with a sit/stand option. (Tr.

54, 60, 68).   The ALJ found that "the claimant past work as a Certifying Nurse is classified as sedentary in exertion and skilled in nature...The impartial vocational expert testified that the claimant was still able to perform her past relevant work as a Certifying Nurse. Thus, in comparing the claimant's residual functional capacity with the physical and mental demands of the work as a Certifying Nurse, the undersigned finds that since January 2S, 200S, the claimant has been capable of performing the work as a Certifying Nurse." (Tr. 19). Consequently, this case turns on whether Plaintiff can perform a sedentary job with no lifting or carrying. (Tr. 54).

After working in her sedentary position, Plaintiff started working in a job that "could go up to heavy to very heavy duty as performed, at any given time throughout the work shift." (Tr. 60). Plaintiff stopped working at her very heavy position January of 2008 when she sprained her left knee and injured her low back. (Tr. 117, 123).

Plaintiff had been diagnosed with a disc herniation in 2000. (Tr. 181-94). In 2007, spine X-rays had indicated "Degenerative disk disease and facet arthrosis, but no evidence of fracture." (Tr. 196) Left knee MRI indicated joint effusion, a prominent bone bruise, and multiple microfractures. (Tr. 206-07). Lumbar spine MRI indicated:

> Mild central canal stenosis, lateral recess effacement, and foraminal
> encroachment at L4-5 is related to a disk bulge, central disk

protrusion, and posterior element hypertrophy. 2. Posterior element hypertrophy and disk bulge at L5-Sl causes lateral recess effacement and encroachment on the left neural foramen. 3. No evidence of fracture.

(Tr. 201-02).

Plaintiff treated with Dr. Ghigiarelli from February to April of 2008. (Tr. 270-73). She attended physical therapy through March of 2008. (Tr. 256-269). In April of 2008, a nuclear stress test was normal. (Tr. 215-16). Chest X-rays were normal. (Tr. 213).   Dr. Ghigiarelli released her to work "light" duty work with no lifting at that time. (Tr. 358). She did not return after her visit on April 29, 2008. (Tr. 257).

On May 1, 2008, Plaintiff underwent a sleep study. (Tr. 209-11). She reported that she "recently developed swelling in the feet and ankles… an echocardiogram was performed which showed evidence for pulmonary hypertension prompting referral for evaluation for possible sleep apnea." *Id.* Plaintiff reported that "she usually fall[s] asleep within 30 minutes...usually wakes up once or rarely twice a night….usually able to fall back to sleep quite easily...always snores." *Id.* Plaintiff reported that "sometimes" she would fall asleep and nap during the day. *Id.* She reported that "sometimes she finds it a struggle to stay awake during the day. If she lays down in the afternoon sometimes she will fall asleep and nap for 3 hours before she knows it." *Id.* Examination

indicated normal strength, intact sensation, and steady "gait including tandem gait." *Id.*  Plaintiff was scheduled for a sleep study. *Id.*

On May 8, 2008, Plaintiff established care with Dr. Leroy Pelicci, M.D. (Tr. 289). He noted that Plaintiff had tried "light duty capacity, on two occasions, but she was unable to function." (Tr. 287). She reported "numbness and tingling, but also a significant weakness in the right leg. She continues to have pain in the left knee, but it has subsided significantly. It is only described as minimal to moderate, at this point." (Tr. 287). He observed that she "appear[ed] to be in pain, grimacing. very uncomfortable, hard time sitting, and shifts her weight. She puts more weight on her left buttock, and changes positions frequently." (Tr. 287). He observed abnormal reflexes, decreased strength, muscle spasm, positive straight leg raise, and limping gait. (Tr. 287). Dr. Pelicci recommended "an aggressive pain management program." (Tr. 287). Dr. Pelicci recommended that she "not return to work." (Tr. 287).

In June of 2008, Plaintiff reported continued pain despite treatment with narcotic pain medication, muscle relaxants, and anti-inflammatories. (Tr. 291). Dr. Pelicci referred Plaintiff to physical therapy and performed an injection. (Tr. 291). Later that month, Plaintiff reported continued pain with "a hard time sitting for any extended period of time." (Tr. 292). Dr. Pelicci performed another injection. (Tr.

292). Plaintiff reported "[n]o untoward side effects" from her medication. (Tr. 292). In August of 2008, she reported pain and problems walking. (Tr. 293).

On August 15, 2008 and August 22, 2008, Plaintiff treated with chiropractor Dr. Mary Ann Hordesky, D.C. (Tr. 282). She "responded favorably to treatment...had less pain and greater freedom of movement post treatment." (Tr. 282, 286). On August 22, 2008, Plaintiff reported "initially she was sore from the last chiropractic treatment but then felt better from it." (Tr. 286). She reported pain that was worse with "weight bearing activity." (Tr. 286). Plaintiff "responded favorably to treatment today. She had less pain and greater freedom of movement post treatment and is scheduled to return for a follow up in one week." (Tr. 286).

In September of 2009, Plaintiff reported to Dr. Pelicci that she had ongoing pain. (Tr. 294). Examination indicated decreased reflex tone and abnormal gait. (Tr. 294). In October of 2008, Plaintiff reported "significant" stiffness and pain, with a hard time "getting around." (Tr. 296). Plaintiff would "be trying to go back to work in a part-time position. Obviously, she is apprehensive, but she is, at least, in a positive frame to see whether or not she can accomplish this." (Tr. 296). Plaintiff had decreased reflexes and positive straight leg raise. (Tr. 295). October 20. 2008, Dr. Pelicci noted that Plaintiff had been unable to perform light work when she attempted to go back to work. (Tr. 298). In November of 2008, Dr. Pelicci wrote that Plaintiff had medical problems "which would preclude her from

sitting on a jury." (Tr. 310, 318). On November 12, 2008, Dr. Pelicci wrote that Plaintiff could not "sit, stand, or walk for any extended period of time, without becoming extremely uncomfortable." (Tr. 299).

Plaintiff returned for monthly injections through June of 2009, continued reporting pain, and exhibited decreased reflex tone. (Tr. 294, 296, 299, 301-04, 309). She continued denying adverse medication side effects. *Id.* At every visit, Dr. Pelicci noted "[t]he patient tolerated the procedure well and experiences good relief. The injections give an extended period of relief and pain control as it pertains to the myofascial spasms, trigger points and tender areas...The treatment overall improves the mood and increases functionality. The patient is more motivated, sleeping better and overall improved. The patient is to return in approximately one month." *Id.* In May of 2009, EMG and lumbar spine MRI continued to demonstrate nerve root involvement, muscle spasm, and other abnormalities. (Tr. 306-07, 389-90).

On June 19, 2009, Dr. Pelicci testified on Plaintiff's behalf in her workers' compensation claim. (Tr. 333). He testified that Plaintiff was not capable of performing her job as described at Moses Taylor Hospital, which was very heavy. (Tr. 344). He testified that Plaintiff "gets relief" for "three to four weeks," so he provided her with monthly injections. (Tr. 349). He testified that she was "not able to work in any capacity." (Tr. 353). He testified that the injections made Plaintiff

"more functional in her activities of daily living," but could not "return [to] functioning as a nurse." (Tr. 365).  He testified that he had not "discussed…any ranges in terms of activities of daily living, how long she can sit, how long she can stand, how much she can lift, et cetera." (Tr. 370).

There is no evidence in the record of treatment from June of 2009 through February of 2011. Doc. 6.

In February of 2011, Plaintiff had an initial visit with Dr. Giovanni Ramos. (Tr. 379). She was "most frustrated with her tobacco use and the limitation on her lifestyle her copd is placing on her. Diabetes has been fairly stable." (Tr. 379). Plaintiff denied "headache, dizziness, lightheadedness...changes in vision...chest pain or palpitations...cough or shortness of breath...heartburn or dyspepcia...changes in bower movements including diarrhea or constipation...urinary problems…'no musculoskeletal pain'....fevers or chills..change in energy or mood." (Tr. 379). Examination was normal with "no major neurological or psychiatric problems noted." (Tr. 379).

In August of 2011, Dr. Ramos reported Plaintiff denied "headache, dizziness, lightheadedness...changes in vision...chest pain or palpitations...cough or shortness of breath...heartburn or dyspepcia...changes in bower movements including diarrhea or constipation...urinary problems…'no musculoskeletal pain'....fevers or chills..change in energy or mood." (Tr. 378). Examination was

normal with "no major neurological or psychiatric problems noted." (Tr. 378).had

stopped smoking, .(Tr. 378).

On May 4, 2011, Dr. Thomas Allarydyce, M.D., performed an independent

medical examination (Tr. 425-30). Plaintiff complained of low back and right leg

pain. (Tr. 426). Plaintiff reported that her pain was worse when "staying in one

position." (Tr. 426). Plaintiff reported pain and that she could only sit for thirty

minutes. (Tr. 427). Dr. Allarydyce performed an extensive physical examination.

(Tr. 427).

Dr. Allarydyce also undertook an extensive records review, reviewing:

- IME 4-29-10 reviewed including my diagnosis of degenerative disc disease of the lumbar spine with an unknown pre-work injury back diagnosis. I also mentioned that invasive forms of treatment would predictably fail and should be avoided . I placed her on 4- 28 - 10 , at light work for transition purposes
- 7- 3-08 Dr . Pelicci no work. Modified duty Registered Nurse Job Description reviewed.
- RN on-call job description reviewed. Under essential functions bullet numbers 1, 2, 3, 4, 9 and 11 are X'd out . Physical demands of the job reviewed. Job description, modified duty, Registered Nurse , June 8,2009 reviewed.  RN on - call job duty reviewed.
- 1-31- 11 for low back pain , right greater than left leg pain . Injections were given in the lumbar spine .
- Dr. Horchos dated 5-19 -1 0. 15% whole person impairment .
- Dr Draper 4-27-09 previously reviewed in my initial IME diagnosing LS strain, contusion of the left knee resolved and contusion of the head resolved. Physical capacity at medium heavy work .
- May 8 , 2008 , Dr. Pelicci for lumbosacral myofascial pain syndrome and associated radiculopathy. Symptoms in the low back from 19 93 to 1999 prior to this work injury.

- o EMG shows bilateral L4-5 and S1 involvement.
- o Dr . Pelicci notes June 2 , 2008, June 30 , 2008 , August 14 , 2008, September 11, 2008 , October 8, 2008, October 16, 2008, October 20, 2008 , November 12, 2008 , December 8, 2008 , January 12, 2009, February 10, 2009 reviewed.
- o IME Dr . Fabiani 8-13- 08 previously reviewed in my initial IME. No pre-injury records here available for his IME , but a back injury in 1993 is mentioned.
- o  Physical Caps Dr. Fabiani put her at sedentary. He states that if local lumbosacral fascia blocks don't help, no other invasive treatment would be reasonable.

(Tr. 428-29). He opined that Plaintiff was experiencing an "exacerbation of arthritis" but "she can go back and transition back to work." (Tr. 429). He opined that she was "capable of the RN on-call position which would fall under light work. I filled out a Physical Cap at light work understanding that there are no orthopedic restrictions on her and this is purely for transitional purposes." (Tr. 429). He opined that she could stand, walk or sit for eight hours out of an eight-hour work day. (Tr. 430).

Plaintiff underwent another series of injections with Dr. Pelicci in from June of 2011 through December of 2011. (Tr. 385-91). In contrast to her series of injections in 2008 and 2009, Plaintiff typically reported that she could "cope" and was doing "well," and does not mention pain while sitting. *Id.*  She continued denying adverse medication side effects. *Id.*  At every visit, Dr. Pelicci noted "[t]he patient tolerated the procedure well and experiences good relief. The injections give an extended period of relief and pain control as it pertains to the myofascial

spasms, trigger points and tender areas...The treatment overall improves the mood and increases functionality. The patient is more motivated, sleeping better and overall improved. The patient is to return in approximately one month." *Id.*

Plaintiff was notified by the Pennsylvania Bureau of Workers' Compensation that she was "capable of working." (Tr. 425). In a workers' compensation agreement in November of 2011, Plaintiff agreed to a lump sum payment of $68,000.00, which represented a monthly payment of $214.65 (to be used to offset any "Social Security" benefits). (Tr. 124). Plaintiff agreed that her employer would not be liable for future medical bills. (Tr. 126). Plaintiff reported that she had "not applied for SSDI and/or SSI benefits and has no intention to file for said benefits at this point in time." (Tr. 125). Two months later, she applied for benefits under the Act. (Tr. 20, 129).

In February of 2012, Dr. Sherry Winn, O.D., wrote that:

Barbara Walder has been a patient of mine since December 2008. Her systemic history has been remarkable for diabetes, hypertension, and asthma. Her ocular history has been remarkable for suspicion of glaucoma. Her intraocular pressures have been elevated, ranging from 24 mmHg to 31 mmHg at their highest. Her visual field tests, anterior chamber angles and optic nerve analysis have remained unremarkable over the years. Pachymmetry testing has revealed thicker than average corneas, resulting in approximately a 4 mmHg reduction in corrected intraocular pressures. At this time she is monitored every 3 months. Ms. Walder has had no signs of diabetic retinopathy O.U. Most recently, Ms. Walder was diagnosed with a posterior vitreous detachment in November 2011. She has been seen in follow-up for this problem and has not had any signs of retinal involvement. I hope

this information is of value to you. Please contact me if you need any
further information.

(Tr. 395).

On February 29, 2012, Plaintiff completed a Function Report. (Tr. 168). She
reported that her narcotic pain medications and psychotropic medications caused
drowsiness and a "hypnotic effect." (Tr. 168). She reported that she could not sit or
stand for more than a half an hour and could not walk for more than 100 feet. (Tr.
166). She reported that she did not complete tasks and could not concentrate for
long enough to finish a movie. (Tr. 166). She reported problems socializing,
dealing with stress, and dealing with change. (Tr. 167). She reported that she could
only drive short distances, could not use her oven, and relied on her sister, who
lived next door, for help shopping and performing daily activities. (Tr. 162-66).
She reported that she "lays down a lot" and has "difficulty being in one position for
too long." (Tr. 161-62).

In March 2012, state agency physician Dr. Kurt Maas, M.D., a state agency
physician, reviewed the record and opined that Plaintiff could perform a range of
light work (Tr. 79-81). In May 2012, state agency psychologist  Dr. John Rohar,
Ph.D., reviewed the record and opined that Plaintiff had no medically determinable
mental impairments (Tr. 87).

In March of 2012, an exercise stress test was normal. (Tr. 417). In May of
2012, chest X-rays were normal. (Tr. 416).

In June of 2012, physical examination by Dr. Giovanna G. Ramos was normal. (Tr. 424). Plaintiff's only medication was Vitamin D. (Tr. 424). Plaintiff denied "headache, dizziness, lightheadedness...changes in vision...chest pain or palpitations...cough or shortness of breath...heartburn or dyspepcia...changes in bower movements including diarrhea or constipation...urinary problems…'no musculoskeletal pain'....fevers or chills..change in energy or mood." (Tr. 424).

On October of 2012, Dr. Ramos noted that Plaintiff reported right shoulder pain, and exhibited pain and tenderness in her shoulder on examination. (Tr. 423). Examination was otherwise normal and Plaintiff denied  "headache, dizziness, lightheadedness...changes in vision...chest pain or palpitations...cough or shortness of breath...heartburn or dyspepcia...changes in bower movements including diarrhea or constipation...urinary problems....fevers or chills..change in energy or mood." (Tr. 424). There were "no major neurological or psychiatric problems noted." (Tr. 423). There is no evidence of any treatment after this date through the date of the ALJ decision on June 19, 2013. (Tr. 20).   In May of 2013, Plaintiff testified at the ALJ hearing that she had insurance, and her only recent treatment were two primary care visits in 2012. (Tr. 62). She testified that her symptoms had been present since she stopped attempting to work in 2009. (Tr. 64).

She testified to problems sitting, stating "I can sit for, maybe, 30 to 40 minutes before I have to stand up and walk around. I can be in any position for,

maybe, 30 minutes, to 40 minutes, before I have to move." (Tr. 64). She also testified to problems with her eyesight. (Tr. 65). She testified that she had decided not to renew her nursing license. (Tr. 58). She testified that she could not "drive distances," more than ten miles. (Tr. 52). She testified that she was right handed. (Tr. 50). She testified that she could not "read a chart well," "certainly can't lift anyone," and felt that she did not "trust [herself] after [she took] her medications that [her] concentration is good enough to actually have somebody's life in [her] hands, or even at a computer." (Tr. 66). She testified that her medications cause her to be "very groggy" and "lose [her] concentration." (Tr. 66).

## IV.    Plaintiff Allegations of Error

### A.    RFC

Plaintiff asserts that the ALJ erred in evaluating various pieces of evidence to conclude that she had the RFC to perform simple, low-stress work. (Pl. Brief); (Pl. Reply). Different types of evidence require different levels of evaluation. Whether the ALJ properly evaluated a particular piece of evidence depends on a number of factors, including its substance; its source; and whether it is medical, non-medical, or medical opinion evidence.

The ALJ must consider all of the evidence. *See* 20 C.F.R. §404.1512. However, "there is a distinction between what an adjudicator must consider and what the adjudicator must explain in the disability determination or decision." SSR

06-3p. *See also Phillips v. Barnhart,* 91 Fed.Appx. 775, 780 (3d Cir. 2004) ("the ALJ's mere failure to cite specific evidence does not establish that the ALJ failed to consider it") *quoting Black v. Apfel*, 143 F.3d 383, 386 (8th Cir.1998). Thus, the ALJ does not need to cite evidence in the decision if the ALJ is only required to consider it. *Id.*; *see also Hur v. Comm'r Soc Sec.*, 94 F. App'x130, 133(3d Cir. 2004) ("There is no requirement that the ALJ discuss in its  opinion every tidbit of evidence included in the record").

The Third Circuit and SSR 06-3p provide that third-party statements must be explicitly addressed. *See Burnett v. Comm'r of Soc. Sec. Admin.*, 220 F.3d 112, 122 (3d Cir.2000) ("we expect the ALJ to address the testimony of such additional witnesses"); SSR 06-3P. The Regulations provide that an ALJ explicitly weigh a third-party statement that meets the definition of "medical opinion." 20 C.F.R. §404.1527(a)-(d). The ALJ must provide "good reasons" for the weight assigned to a medical opinion from an individual who meets the definition of "treating source." 20 C.F.R. §404.1527(c)(2). The Regulations and Third Circuit case law require that a medical opinion from an individual who meets the definition of a "treating source" be afforded special deference ("treating source medical opinion"). 20 C.F.R. §404.1527(c)(2); *see also Burns v. Colvin*, No. 1:14-CV-1925, 2016 WL 147269 (M.D. Pa. Jan. 13, 2016) (internal citations omitted). The Regulations and Third Circuit case law prohibit an ALJ from rejecting a treating source if the only

contradictory evidence is medical, not non-medical or medical opinion. *Id.* The ALJ must make an explicit credibility finding on Plaintiff's credibility and afford Plaintiff's statements either serious consideration or great weight and. *See Mason v. Shalala*, 994 F.2d 1058, 1067 (3d Cir. 1993).

Plaintiff correctly notes that Plaintiff was not capable of "performing her past work as a registered nurse." (Pl. Brief at 5). The ALJ did not find that she could return to her past, heavy work as a nurse, but could return to her past, sedentary work at the insurance company. Plaintiff asserts that this "ignored the way the job was actually performed." (Pl. Brief at 5). Plaintiff does not elaborate on this argument. *See* Local Rule 84.40.4(b) ("The court will consider only those errors specifically identified in the briefs"). Plaintiff testified that she had worked at Northeastern Pennsylvania Physician's Organization ("NEPO") "certify[ying] clients to have different procedures for [an insurance company]." (Tr .53). She explained that this was "a phone job" with "mostly sitting" and no "lifting or carrying." (Tr. 54). The VE characterized this as a sedentary job with a sit/stand option. (Tr. 54, 60, 68).   Plaintiff's testimony and the VE testimony provide substantial evidence to conclude that Plaintiff's position, as actually performed, was sedentary with no lifting. *See* SSR 00-4p.

Plaintiff asserts that the ALJ erred in rejecting treating source "medical opinions" from Dr. Ghigiarelli and Dr. Pelicci. (Pl. Brief at 5-7). However, Dr.

Ghigiarelli's opinion supports the ALJ's decision, because he opined that Plaintiff could perform light work with no lifting. (Tr. 358). Similarly, Dr. Pelicci opined only that Plaintiff could not return to her past, very heavy work. (Tr. 344). He testified that he had not "discussed…any ranges in terms of activities of daily living, how long she can sit, how long she can stand, how much she can lift, et cetera." (Tr. 370). Dr. Pelicci's opinion is ambiguous and does not contradict the ALJ's finding that Plaintiff could perform sedentary. (Tr. 370). Plaintiff certainly could have submitted an updated, specific residual functional capacity from Dr. Pelicci, but has not done so. Doc. 6. Dr. Pelicci's statement that Plaintiff cannot work in any capacity is not a treating source medical opinion. Statements on issues reserved to the commissioner are excluded from the definition of "medical opinion" in 20 C.F.R. §404.1527(a), so are not entitled to the deference of a treating source medical opinion. *See* 20 C.F.R. §404.1527(c).

In contrast, Dr. Allarydyce, Dr. Maas, and Dr. Rohar all issued specific functional capacity assessments, and each indicated that Plaintiff could perform at least sedentary work. (Tr. 79-81, 87, 427). Dr. Allarydyce undertook an extensive physical examination and a complete record review. (Tr. 427). Dr. Maas and Dr. Rohar were also able to review an essentially complete record. (Tr. 79-87).

SSR 96-6p provides that a non-treating, non-examining medical opinion may be assigned greater weight than a treating medical opinion in "appropriate

circumstances." SSR 96-6p, 1996 WL 374180 at *3 (July 2, 1996). SSR 96-6p

does not define "appropriate circumstances," but provides an example: when the

non-treating, non-examining source was able to review a "complete case

record…which provides more detailed and comprehensive information than what

was available to the individual's treating source." *Id; see also Brown v. Astrue*, 649

F.3d 193 (3d Cir. 2011) (Affirming where two state agency opinions supported the

ALJ's denial, and one of state agency experts was able to review the entire record

through the date of the ALJ hearing); *Labarre v. Colvin*, No. 1:14-CV-02484, 2016

WL 613593, at *7 (M.D. Pa. Feb. 16, 2016); *Davern v. Colvin*, No.

115CV00162CCCGBC, 2016 WL 702979, at *10 (M.D. Pa. Jan. 20, 2016) *report*

*and recommendation adopted,* No. 1:15-CV-162, 2016 WL 695114 (M.D. Pa. Feb.

19, 2016) ("multiple consistent opinions…provide substantial evidence for the

ALJ's RFC assessment"); *Bergstresser v. Colvin*, No. 3:15-CV-1744, 2016 WL

539038, at *10 (M.D. Pa. Feb. 11, 2016) (Noting that ALJ credited medical

opinion that was "consistent with" another medical opinion)

Consistent with *Brown* and SSR 96-6p, the multiple consistent non-treating

medical opinions with the benefit of reviewing the entire record provide "good

reasons" to reject the opinions of Plaintiff's treating physicians, to the extent that

they contradicted the ALJ's finding that Plaintiff could perform her past sedentary

work. *Brown*, 649 F.3d at 196. The ALJ also relied on Plaintiff's course of

treatment and inconsistent claims. (Tr. 16-20). For instance, Plaintiff only reported medication side effects in connection with her application for benefits. (Tr. 66, 168). She denied side effects at every visit with Dr. Pelicci. (Tr. 294, 296, 299, 301-04, 309, 385-91). Fhe reported an "extended period of relief and pain control" that lasted three to four weeks. *Id.* Moreover, the record contains no evidence of treatment from June of 2009 to February of 2011. Doc. 6. When she returned to care in February of 2011 with Dr. Ramos, she reported "no musculoskeletal pain." (Tr. 379). At her only other treatment visit in 2011, in August of 2011, she again reported "no musculoskeletal pain." (Tr. 378). In the interim, she reported to the independent medical examiner in April of 2011 that she suffered significant pain. (Tr. 425-30). There is no mention of pain while sitting after June of 2009. (Tr. 385-91). Her only treatment in 2012 consisted of two primary care visits with Dr. Ramos. (Tr. 423-24). At one she reported "no musculoskeletal pain" and at the other, she reported pain only in her right shoulder. *Id.* The record shows no evidence of any treatment from October of 2012 through the date of the ALJ decision in June of 2013. Doc. 6. Given all these facts, it was appropriate to rely on the non-treating medical opinions. *See* SSR 96-6p.

Because the ALJ properly assigned weight to the medical opinions, substantial evidence supports the RFC. Plaintiff has failed to demonstrate that no reasonable person would have denied her benefits. *See Pierce v. Underwood*, 487

U.S. 552, 565 (1988) (Court will affirm ALJ's factual findings unless no "reasonable mind" would reach the same conclusion) (internal quotation omitted). The Court would "refus[e] to direct a verdict" in Plaintiff's favor if this were a jury trial. *Reefer v. Barnhart*, 326 F.3d 376, 379 (3d Cir. 2003) (internal quotation omitted). Substantial evidence supports the RFC and denial of benefits. *Id.*

### V.    Conclusion

The Court reviews the ALJ's decision under the deferential substantial evidence standard. *Reefer v. Barnhart*, 326 F.3d 376, 379 (3d Cir. 2003). Substantial evidence supports the ALJ decision unless no "reasonable mind might accept [the relevant evidence] as adequate to support a conclusion." *Id.* (internal citations omitted). "Stated differently, this standard is met if there is sufficient evidence 'to justify, if the trial were to a jury, a refusal to direct a verdict.'" *Id.* (quoting *Universal Camera Corp. v. NLRB,* 340 U.S. 474, 477, 71 S.Ct. 456, 95 L.Ed. 456 (1951)). Here, a reasonable mind might have denied Plaintiff benefits. The Court would refuse to direct a verdict in Plaintiff's favor if this was a jury trial. Accordingly, the Court will affirm the decision of the Commissioner pursuant to 42 U.S.C. § 405(g).

An appropriate Order in accordance with this Memorandum will follow.

Dated: March 31, 2016                      _____s/Gerald B. Cohn_____
                                                     GERALD B. COHN
                                          UNITED STATES MAGISTRATE JUDGE